WHITMYER BROS., INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. JAMES K. DOYLE, *ET AL.*, DEFENDANTS-APPELLANTS, AND JAMES K. DOYLE, *ET AL.*, DEFENDANTS-COUNTERCLAIMANTS, v. WHIT-MYER BROS., INC., A NEW JERSEY CORPORATION, PLAINTIFF, AND SAM CODARIO, *ET AL.*, IMPLEADED DEFENDANTS TO THE COUNTERCLAIM.

Argued January 11, 1971—Decided March 8, 1971.

26

Mr. *William Tomar* argued the cause for appellants (*Messrs. Plone, Tomar, Parks and Seliger,* attorneys; *Mr. Samuel Mandel,* on the brief).

Mr. *James Hunter, III* argued the cause for respondent (*Messrs. Archer, Greiner, Hunter & Read,* attorneys; *Mr. Charles W. Heuisler* and *Mr. Lee M. Hymerling,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The plaintiff Whitmyer Bros., Inc. is a New Jersey corporation engaged primarily in erecting highway guard rails, signs and fences and other items with similar functions. The defendant James K. Doyle entered the plaintiff's employ in 1949 and later became an officer and director. On March 2, 1967 Whitmyer and Doyle executed an employment agreement which stipulated that Whitmyer employed Doyle as General Manager of the Northern Division for three years with provision for automatic renewal unless terminated on 90 days notice. Doyle duly gave the 90-day notice and terminated his employment with Whitmyer, effective March 2, 1970. In April, 1970 Doyle and the defendant George Smith formed the defendant Statewide Hi-Way Safety, Inc. Smith had been an employee and director of Whitmyer but left that company in 1967 to join the J. Marienski Contracting Company. He organized Marienski's guard rail and fence division which thereafter competed with Whitmyer though on a relatively small scale. Towards the end of March, 1970 Marienski agreed to sell its guard rail and fence division and Statewide has taken it over

and has expanded its operations. On April 20, 1970 the defendant Richard Wetterau, a former employee of Whitmyer, joined Statewide.

On June 17, 1970 Whitmyer filed a complaint in the Chancery Division naming Doyle, Statewide, Smith and Wetterau as defendants. The complaint sought enforcement of a restrictive covenant in the employment agreement between Doyle and Whitmyer to the effect that Doyle would not, for a period of five years after the termination of his employment, "be connected" in any state east of the Mississippi or in any other state in which Whitmyer had operated within three years, "in any manner with the ownership, management, operation or control of any business" which in the opinion of Whitmyer's Board of Directors is in "competition with the business" of Whitmyer. The complaint prayed for suitable restraint against all of the defendants along with an accounting of profits, damages, etc. The defendants filed answer and counterclaim and voluminous affidavits were filed on behalf of the respective parties. The affidavits on Whitmyer's behalf were largely designed to establish that, while in Whitmyer's employ, Doyle had a high executive position and was entrusted with confidential information which may not justly be made available to Whitmyer's competitors. On the other hand the affidavits on behalf of the defendants were largely designed to establish that, although Doyle acquired his general knowledge or skill in the trade while in Whitmyer's employ, he was not entrusted with and did not acquire any confidential information which should justly remain as such for the protection of Whitmyer's legitimate business interests.

In his affidavit, Doyle states that although his title at Whitmyer was manager of the Northern Division his title was a hollow one since most of his time "was spent collecting money from accounts receivable by contacting contractors over the telephone." He acknowledges that he assisted in preparing bids but affidavits by Smith and Wetterau specifically dealt with the bidding aspects and disputed the

assertions in an affidavit by Peter Hegedus, manager of Whitmyer's engineering department, that Whitmyer's bidding procedures and constituent elements were highly confidential. In his affidavit, Smith states that for eighteen years he has been involved in various aspects of the guard rail and fence business, which is the principal business of both Whitmyer and Statewide. He points out that contracts for guard rails and fences are obtained "almost exclusively by bidding with public authorities or bodies or prime contractors for such authorities or bodies" and that "nearly all contracts are awarded solely on the basis of price."

Smith states that he considers essentially the same factors as does Hegedus in formulating a bid; they include (1) material, (2) labor, (3) equipment, (4) insurance and fringe benefits, (5) overhead, and (6) profits. He denies that there is anything confidential about these factors, stating that "there are no special suppliers for the materials used in constructing guard rail and fence," that "suppliers are known by and to everyone in the trade," and that "anyone competing in this business may negotiate with the suppliers." Insofar as labor is concerned he states that "all of the labor utilized in the guard rail and fence business belong to unions for the particular activity which they perform" and that "rates are set by union contracts, and are uniform in the industry." Finally, Smith notes that bidding computations "vary from job to job," that "a former employee of Whitmyer would have no way of knowing the variables on a future job" and that it is "impossible to predict Whitmyer's bid on any given job situation."

In his affidavit, Wetterau denies that Doyle had ever solicited or approached him with respect to employment by Statewide. He states that in February, 1970 he received a salary reduction at Whitmyer, in March he submitted his resignation, and in April he took a job with Statewide. While at Whitmyer he did estimate work and was familiar with the way bids were formulated. He states that Whitmyer's bids were formulated in the same manner as bids

are formulated at other companies and that "there is nothing secret or confidential with regard to the component parts in formulating the bid." He denies that he knows anything about the "revised procedure" which is referred to in Whitmyer's complaint and also denies that he ever had access to any confidential information at Whitmyer, other than particular bids which became public property · after their transmission to the public bodies and disclosure by them. He acknowledges that the factors referred to by Hegedus are those used but notes that "the component parts vary, sometimes substantially, from job to job" and that Whitmyer's bid cannot be predicted unless its estimates of the constituent items, "which estimates vary from job to job," are actually known.

There are additional factual disputes in the affidavits which need not be dealt with at this juncture. The trial judge after considering the affidavits and legal memoranda concluded that the plaintiff was entitled to a preliminary injunction restraining the defendant Doyle, along with those acting in concert with him, "from competing, east of the Mississippi River or in any other State in which Whitmyer Bros., Inc., operated within three years prior to March 2, 1970 with plaintiff and from, directly or indirectly, owning, managing, operating, controlling or being employed by or participating in or connected in any manner with the ownership, management, operation or control of any business in competition with the business of Whitmyer Bros., Inc." The trial judge made no findings as to the controverted factual issues nor did he define or point to the plaintiff's "legitimate interests" which he considered to be entitled to judicial protection by way of preliminary restraint. *See Solari Industries, Inc. v. Malady,* 55 *N. J.* 571, 576 (1970). He did not mention any consideration of "undue hardship on the employee" or injury "to the public" (*Solari, supra,* 55 *N. J.* at 576) but expressed the narrow view that the issue was "almost completely one of the violation of the agreement between the parties Whitmyer and Doyle

dated March 2, 1967." Although he did not believe that any preliminary restraint should be issued specifically against Smith, Wetterau or Statewide, he considered that Doyle's position was "completely different." He noted that Doyle had "chosen to go into a competitive company" and that that was "exactly the reason why the plaintiff sought and secured the restrictive covenant." So far as the breadth of the restriction was concerned, he would not then say that it was unreasonable but he voiced his understanding that *Solari, supra*, 55 *N. J.* 571 gave him "an opportunity at a proper time to weigh the fact as to whether or not these are too broad and limit them within the scope that is required."

After the trial judge entered his order restraining Doyle pending final hearing, application was made by Doyle to the Appellate Division for a stay and for leave to appeal. A stay pending determination of the application for leave was granted but later leave was denied and the stay was vacated. Thereafter this Court stayed the interlocutory injunction and granted Doyle leave to appeal. The order granting leave directed the parties to deal with the question as to "what kind of interest will support this kind of restrictive covenant." Briefs were duly filed and the matter has been fully argued.

Doyle's primary position is that he has not taken any trade secrets or confidential information and has not interfered with the good will of the plaintiff's business; he acknowledges that he has acquired general knowledge or skill in the trade but asserts that he has the right to use that general knowledge or skill in the only business he knows in competition with his former employer, and that the restrictive covenant may not lawfully or justly be enforced to preclude such use. *See Dunfey Realty Co. v. Enwright*, 101 *N. H.* 195, 138 *A.* 2d 80, 83 (1957); *Aetna Bldg. Maintenance Co. v. West*, 39 *Cal.* 2d 198, 246 *P.* 2d 11, 16 (1952), 41 *Calif. L. Rev.* 38 (1958), 51 *Calif. L. Rev.* 51 (1963); *Arthur Murray Dance Studios of Cleve-*

*land v. Witter,* 62 *Ohio L. Abs.* 17, 105 *N. E.* 2d 685, 709–11 (C. P. 1952); *McLeod v. Meyer,* 237 *Ark.* 173, 372 *S. W.* 2d 220, 223 (1963); Blake, "Employee Agreements Not to Compete," 73 *Harv. L. Rev.* 625, 651–53 (1960); 6A *Corbin, Contracts* § 1394, *p.* 100 (1962); *cf.* Bodine, J. dissenting in *Irvington Varnish, &c., Co. v. Van Norde,* 138 *N. J. Eq.* 99, 106 (*E. & A.* 1946). Whitmyer's primary position is that its bidding procedures and constituent elements represent trade secrets or confidential information which are lawfully and justly entitled to protection against competitors; it asserts that the covenant "limited in duration to the period of time during which the confidential information remains current, and in space to the area of the employer's business," serves to protect the employer's legitimate interests and does not do any "injustice to the public interest" or "unfairly restrict the mobility" of the employee. *See Solari Industries, Inc. v. Malady, supra,* 55 *N. J.* at 576, 586; *Ruhl v. F. A. Bartlett Tree Expert Co.,* 245 *Md.* 118, 225 *A.* 2d 288, 293 (1967); Blake, *supra,* 73 *Harv. L. Rev.* at 653, 667–74; *cf. A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.,* 2 *N. J.* 235, 249 (1949); *Ideal Laundry Co. v. Gugliemone,* 107 *N. J. Eq.* 108, 111 (*E. & A.* 1930).

In *Solari, supra,* 55 *N. J.* 571, we recently adopted the judicial rule that noncompetitive agreements may receive total or partial enforcement to the extent reasonable under the circumstances. However, we pointed out that while a seller's noncompetitive covenant designed to protect the good will of the business for the buyer is freely enforceable, an employee's covenant not to compete after the termination of his employment is not as freely enforceable because of well recognized countervailing policy considerations. 55 *N. J.* at 576. Nonetheless an employee's covenant will be given effect if it is reasonable under all the circumstances of his particular case; it will generally be found to be reasonable if it "simply protects the legitimate interests of the employer, imposes no undue hardship

on the employee, and is not injurious to the public." 55 *N. J.* at 576.

The employer has no legitimate interest in preventing competition as such; the authorities generally recognize this (Blake, *supra,* 73 *Harv. L. Rev.* at 652; *Corbin, supra* at 100) and the underlying policy finds recent legislative expression in New Jersey's Antitrust Act. *L.* 1970, *c.* 73; *N. J. S. A.* 56:9–1 *et seq.* But the employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships. In *Solari, supra,* 55 *N. J.* 571, the employee was an executive who had direct dealings with customers and prospective customers and who had covenanted not to sell any competitive products or systems for a year after the termination of his employment. The employer Solari did not assert that any trade secret or confidential business information was jeopardized but did assert that the employee represented a substantial risk to the employer's relationships with its customers. No preliminary injunction was granted but the matter was remanded for final hearing with the suggestion that, if the showing at the hearing so warranted, the employer might equitably be awarded a limited restraint against the employee dealing within a year "with any of Solari's actual customers or prospective customers in the United States with whom he had substantial dealings on Solari's behalf while in Solari's employ." 55 *N. J.* at 586.

The employer's legitimate interests in protecting his trade secrets and the like have been long recognized even in cases without noncompetitive agreements (*Sun Dial Corp. v. Rideout,* 16 *N. J.* 252 (1954)) though reasonably confined noncompetitive agreements may properly serve to avoid difficulties of definition and proof. 2 *Callmann, Unfair Competition* § 64.4(b), *p.* 641 (3d. ed. 1968); *see Water Services, Inc. v. Tesco Chemicals, Inc.,* 410 *F. 2d* 163, 171 (5 *Cir.* 1969). However, matters of general knowl-

edge within the industry may not be classified as trade secrets or confidential information entitled to protection nor will routine or trivial differences in practices and methods suffice to support restraint of the employee's competition. *See* Blake, *supra,* 73 *Harv. L. Rev.* at 671–73; *cf. Aetna Bldg. Maintenance Co. v. West, supra,* 246 *P.* 2d at 16; *Dunfey Realty Co. v. Enwright, supra,* 138 *A.* 2d at 83; *McLeod v. Meyer, supra,* 372 *S. W.* 2d at 223.

In *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., supra,* 2 *N. J.* 235, the Court enforced a restriction against postemployment competition. Though the opinion contains some ambiguous expressions, the facts relied on bring the case fairly in line with *Solari, supra,* 55 *N. J.* 571 and with what has been said earlier in this opinion with respect to the protection of the legitimate interests of the employer. The Court in *Hollander* specifically noted that the employee there "was placed in a special position to learn the various secret formulae and processing methods" of the employer; through "possession of the formula books and supervision of the dye house, he became intimately acquainted with and fully cognizant of the very core" of the employer's successful operations; and through his discovery of a new dye formula, which under the terms of the employment became the sole property of the employer, he had confidential information which he had used in competing with his employer. 2 *N. J.* at 249.

More troublesome is the decision, by a vote of eight to six, in *Irvington Varnish, &c., Co. v. Van Norde, supra,* 138 *N. J. Eq.* 99. There the complaint seeking enforcement of a noncompetitive agreement asserted that the employee had gained confidential information as to the complainant's machinery, equipment, processes and methods, which were secret and not to be revealed to a competitor. The trial court found that the complainant had failed to prove that the defendant had such confidential information and accordingly denied any restraint. In reversing, the majority expressed the view that it was not necessary that the com-

plainant's methods or processes be, in fact, secret in the sense that they were known only to the employer and those in whom he confided. 138 *N. J. Eq.* at 105. The dissenters pointed out that the proofs in the case did not disclose that there were "any unusual processes followed by the complainant" and that the effect of the majority opinion was to prohibit competition as such and to deprive the employee of the right to use his general skills "in the only industry he has knowledge of." 138 *N. J. Eq.* at 106. On their interpretation of the record before them, we subscribe fully to their dissent though we note that the commentators have narrowly construed the majority opinion in *Irvington* as restraining the employee because of his possession and the substantial risk of his transmission of the employer's trade secrets or confidential business information. *See* Blake, *supra,* 73 *Harv. L. Rev.* at 676, n. 171; *Callmann, supra,* § 64.4(b) at 641; *see also Water Services, Inc. v. Tesco Chemicals, Inc., supra,* 410 *F.* 2d at 171.

*Solari, supra,* 55 *N. J.* 571, citing *Corbin, supra,* among others, stressed that the employer would be entitled only to that limited measure of relief within the terms of the noncompetitive agreement which would be reasonably necessary to protect his "legitimate interests," would cause "no undue hardship" on the employee, and would "not impair the public interest." 55 *N. J.* at 585. *Corbin* of course recognized that the legitimate interests of the employer would include protection of his trade secrets and confidential business information along with his customer relationships but would not include the prevention of competition as such; as he put it, a postemployment restriction on an employee requires special justification which is nonexistent where "the harm caused by service to another consists merely in the fact that the new employer becomes a more efficient competitor just as the first employer did through having a competent and efficient employee. A restraint on the employee is illegal when its purpose is the prevention of competition, except when the methods of competition to be

prevented are methods commonly regarded as improper and unfair." *Corbin, supra* § 1394 at 100.

Application of the foregoing is well illustrated by the court's opinion in *Vander Werf v. Zunica Realty Company,* 59 *Ill. App.* 2d 173, 208 *N. E.* 2d 74 (1965). A real estate salesman covenanted that he would not within two years after leaving his employment engage in the real estate business within five miles from his employer's place of business. He breached the agreement but he took no confidential information from his former employer nor did he solicit his former employer's customers. Although it was conceded that the area and time limitations were not unreasonable, the court denied injunctive relief on the ground that protection of the employer's legitimate interests did not require any restraint of the employee; in the course of its opinion it said:

Generally, how much protection is needed by an employer depends upon the legitimate interests for which he may claim protection. Legitimate interests is only another term to describe those "special circumstances" which render an employee's restraint necessary, but protection against ordinary competition itself is not sufficient. The authorities indicate that the "special circumstances" which have been controlling and important in determining the reasonableness of the restraint imposed generally involve elements of trade secrets and unfair dealings. Brunner & Lay, Inc. v. Chapin, 29 Ill. App. 2d 161, 172 N. E. 2d 652 (1961) ; Snyder v. Hamilton, 39 Ill. App. 2d 352, 189 N. E. 2d 97 (1963) ; In Re Solar Textiles Co. v. Fortino, 46 Ill. App. 2d 436, 196 N. E. 2d 719 (1964). 208 *N. E.* 2d at 76.

In *Dunfey Realty Co. v. Enwright, supra,* 101 *N. H.* 195, 138 *A.* 2d 80, the trial court found that there were no trade secrets or confidential materials which the employee could use to his former employer's detriment and refused therefore to enforce a postemployment restrictive covenant. This was affirmed in an opinion which held that the employer "must show more than that its methods and procedures were not known to the general public. It must establish that such secrets were exclusively its own and not general secrets of the trade." 138 *A.* 2d at 83. In *Aetna*

*Bldg. Maintenance Co. v. West, supra,* 39 *Cal.* 2d 198, 246 *P.* 2d 11, the court found on the evidence before it that the employer's procedures for estimating prices on new contracts for janitorial service and building maintenance were not trade secrets or business confidences. 246 *P.* 2d at 16. And in *McLeod v. Meyer, supra,* 237 *Ark.* 173, 372 *S. W.* 2d 220, the court expressed the thought that knowledge which the employee had gained as to how to bid for a job of clearing rights of way and keeping them clear was hardly to be classified as a secret formula but was simply the knowledge "which one acquires by experience" in the trade. 372 *S. W.* 2d at 223.

■■ In the case at hand the trial judge did not give any effect to the important limiting considerations governing the postemployment restrictive covenant. He evidently considered that, since the covenant and its breach were acknowledged, the employer was entitled to a broad preliminary restraint pending final hearing at which time he might limit the scope of the restraint. But under the controlling principles, the employer was not entitled to preliminary restraint unless it made a suitable showing that such restraint was necessary to protect its legitimate interests and that it would not impose undue hardship on the employee or injure the public. The employer did make verified assertions that Doyle had trade secrets or confidential information, particularly with respect to its bidding procedures and constituent elements, but those assertions were flatly and fully denied in the affidavits submitted on behalf of the defendants. The doubtful nature of the employer's claimed trade secrets or confidential information and the comprehensiveness of the verified denials by the former employees clearly point to the inappropriateness of any preliminary relief grounded on the suggested legitimate interests of the employer in its trade secrets or confidential information. *See Solari, supra,* 55 *N. J.* at 586; *cf. Benton v. Kernan,* 126 *N. J. Eq.* 343, 345 *(E. & A.* 1939); *Accid. Index Bur., Inc. v. Male,* 95 *N. J. Super.* 39, 50 *(App. Div.*

1967), *aff'd*, 51 *N. J.* 107 (1968), *appeal dismissed*, 393 *U. S.* 530, 89 *S. Ct.* 872, 21 *L. Ed.* 2d 754 (1969).

The plaintiff may have legitimate interests in protecting its customer relationships but the record before us does not support any preliminary relief in this connection any more than it does in connection with the plaintiff's suggested trade secrets or confidential information. Most of the plaintiff's customers are governmental entities, along with prime contractors doing work for them, and most of the work involves public bidding. The industry as a whole is fully aware when public work is available and the determining factor is generally price rather than personal consideration. There appears to be little likelihood that Doyle would be in any position to harm the plaintiff's relationships with the governmental entities or with prime contractors doing work for them. So far as any incidental private customers of the plaintiff are concerned there is a denial by Doyle of improper solicitation (*cf.* Blake, *supra,* 73 *Harv. L. Rev.* at 653–66) along with a denial of any unfair activities or practices on his part (*cf. Corbin, supra* § 1394 at 100). These matters may of course be dealt with fully at final hearing together with other issues which are referred to in the pleadings and briefs but which require no discussion or determination at this stage. *Cf. Solari, supra,* 55 *N. J.* at 585–586. The order granting the preliminary injunction below is:

Reversed and the cause is remanded to the Chancery Division for further proceedings.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.