**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5849-17T3
              A-0434-18T3

MARIGOLD MANAGEMENT,
INC., d/b/a A DOLLAR,

      Plaintiff-Respondent,

v.

RAMALINGAM ARUMUGAM
and MEENAKUMARI KRUPPIAH,
a/k/a MEENAKUMARI
ARUMUGAM, as Individuals
and Husband and Wife,

      Defendants-Appellants,

and

M CITY DOLLAR, INC., RAKESH
MALHOTRA and M CITY DOLLAR 4,

      Defendants.

_____

RAMALINGAM ARUMUGAM
and MEENAKUMARI KRUPPIAH
a/k/a MEENAKUMARI ARUMUGAM,
as Individuals and Husband and Wife,

Plaintiffs-Appellants,

v.

MARIGOLD MANAGEMENT,
INC., d/b/a A DOLLAR, SHAUKAT
KASSAM, and RESHMA KASSAM,

Defendants-Respondents.

_____

Submitted March 17, 2020 – Decided August 26, 2020

Before Judges Hoffman, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket Nos. L-0724-16 and L-6512-17.

Law Offices of Susheela Verma, attorneys for appellants (Susheela V. Verma, of counsel and on the briefs; Nishi Jaimin Patel, on the briefs).

Schafkopf Law, LLC, attorneys for respondents (Gary Schafkopf, of counsel and on the brief).

PER CURIAM

In these back-to-back matters, which we consolidate for the purposes of this opinion, defendants Ramalingam Arumugam and Meenakumari Kruppiah a/k/a Meenakumari Arumugam (appellants or the Arumugams) appeal from the July 6, 2018 Law Division order for judgment in favor of plaintiff Marigold

Management, Inc. d/b/a A Dollar (Marigold).[1] In a related action, <u>Marigold II</u>, where they were plaintiffs, the Arumugams appeal from the August 14, 2018 Law Division order granting the summary judgment dismissal of their suit against defendants Marigold, Shaukat Kassam, and Reshma Kassam, and denying their cross-motion for leave to file an amended complaint.

On January 15, 2016, Marigold filed suit against appellants,[2] alleging they breached a Business Relationship Termination Agreement (the Agreement) they signed on April 20, 2015. Sam, Marigold's sole owner, provided management and consultation services to numerous dollar stores throughout the region. In 1999, Sam began sharing his expertise with Tony, who later opened his own dollar stores under Sam's tutelage. This led to a long-term friendship between Sam and Tony, in addition to a long-term business relationship; however, the

---

[1] For ease of reference, and intending no disrespect, when we refer to an individual party, we use that party's first name, except we refer to Ramalingam Arumugam as "Tony" and Shaukat Kassam as "Sam," the names used to refer to them at trial. In addition, we refer to the first suit as <u>Marigold I</u>, and the second suit, where the Arumugams are plaintiffs, as <u>Marigold II</u>.

[2] Marigold's complaint included three additional defendants – M City Dollar, LLC, Rakesh Malhotra, and M City Dollar 4 (collectively M City) – alleging counts of unjust enrichment, conversion, defamation, tortious interference, and fraud against them and the Arumugams. At the conclusion of the trial, the judge dismissed Marigold's complaint against the M City defendants.

A-5849-17T3

situation changed in 2015, after the pair had a falling out. As a result, Sam and Tony terminated their relationship completely and executed the Agreement,[3] which essentially precluded appellants from competing with Marigold and any dollar stores where Sam provided consultation services for a period of sixty months. The Agreement further provided for a one-time payment of $120,000 to appellants, which Sam immediately paid by certified check.

On November 2, 2017, appellants filed a separate complaint against Marigold and the Kassams (Marigold II). They took this action after the trial court in Marigold I denied their motion to amend their responsive pleading to add additional counts to their counterclaim against Marigold, along with a third-party complaint against the Kassams; however, after appellants filed Marigold II, the trial court in Marigold I reconsidered its decision, in part, and allowed them to amend their counterclaim against Marigold. Since the reconsideration decision did not permit appellants to join the Kassams as third-party defendants, they did not dismiss Marigold II.[4]

---

[3] Sam's attorney prepared the Agreement, which Tony's wife also signed.

[4] Of note, appellants' motion only requested reconsideration of the court's denial of their request to file an amended counterclaim; it did not seek reconsideration of the denial of their request to file a third-party complaint against the Kassams.

A-5849-17T3

Following a bench trial in Marigold I, the trial judge issued an oral decision in favor of Marigold, finding appellants breached a valid contract.[5] The judge concluded appellants breached their contract by helping set up and manage various dollar stores, in violation of the non-competition provision of the Agreement. He described Marigold's losses as "lost opportunities" and the loss of the $120,000 paid as consideration for the non-competition provision. The judge also ruled appellants' breach of contract entitled Marigold to attorney's fees, eventually awarding attorney's fees of $66,861.50, plus costs of $8,875.

In granting the summary judgment dismissal of appellants' complaint in Marigold II, the judge[6] concluded the complaint failed to state a claim upon which relief could be granted. Citing the entire controversy doctrine, res judicata, and collateral estoppel, the judge reasoned that the basis for the entry of the judgment in Marigold I effectively barred the relief sought by the Arumugams in Marigold II. He also denied appellants' motion to file an amended complaint, which sought to add two additional defendants. For the reasons that follow, we affirm.

---

[5] The judge dismissed the remaining counts of Marigold's complaint, concluding Marigold failed to satisfy its burden of proof as to those claims.

[6] The trial judge who presided at the Marigold I trial also decided the motions on appeal in Marigold II.

A-5849-17T3

I

We summarize the following facts from the extensive ten-day trial record. Upon immigrating to the United States, Tony worked as a cashier and stocker at a Massachusetts dollar store, where he met Sam, and their families became friends. At that time, Sam provided consulting services to various dollar stores throughout the northeast. Sam began teaching Tony about the dollar store industry and took him to various trade shows. Sam then assisted the Arumugams in acquiring their own dollar stores, with Sam providing management and consultation services. From 1999 through early 2015, Sam and Tony opened and closed various dollar stores throughout the northeastern United States.

Sam's services, later provided through Marigold,[7] included locating and negotiating retail lease space, soliciting vendors and negotiating prices, ordering supplies, obtaining permits, and performing similar tasks. The services provided by Sam to each store varied; in return, dollar store owners would pay him a monthly fee of $500 to $700. The stores managed by Sam, and then Marigold, often used the name A Dollar, the same name Sam used for the dollar stores he owned; however, there is no registered mark for that name.

_____

[7] Sometime in 2014, Sam purchased Marigold, a New Jersey corporation with no assets, and thereafter operated his dollar store management and consultation business through Marigold.

A-5849-17T3

Sam managed the dollar stores owned by appellants for a fee of $500 a month. According to Tony, neither Sam nor Marigold had written contracts with the dollar stores they serviced; instead, they relied on verbal agreements. He testified that he did the day-to-day work and Sam "handled everything [else]." In early 2015, disagreements between Sam and Tony led them both to want to terminate their business relationship. To that end, Sam had his attorney prepare the Agreement.

The first paragraph of the Agreement obligated Marigold to pay $120,000 to the Arumugams in consideration "for the termination of the relationships referenced in this Agreement, and in full settlement of any other claims against [Marigold] now existing or which may accrue in the future." The third paragraph included the following provision:

> NON-COMPETITION: For a period of sixty (60) months following the date of this Agreement, Arumugams shall not, directly or indirectly, alone or in conjunction with any other person or entity, enter into, own manage, operate, control, or participate in the ownership, management, operation or control of, or become associated with, as an employee, director, officer, advisor, agent, consultant, principal, partner, member or independent contractor with or lender to, any person or entity engaged in or aiding others to engage in business of a Dollar Store, any similar business concept, or any location where [Marigold] operates, located anywhere in a ten (10) mile radius of the business referenced in this Agreement of the store

closed by [Marigold] in the last twenty-four (24) months. For the purposes of this Agreement, any act of any relative or family member of the Arumugams will be deemed to be the act of Arumugams.

In addition to the non-competition provision, paragraph eight required:

CONTACTS: For twenty-four (24) months following the Closing, the Arumugams shall not have any contact with any former, current or future employees of [Marigold]; with any former current or future landlords; or former, current or future vendors that [Marigold] conducts business with that specialize in business of dollar store retail.

If the Arumugams breached the Agreement, paragraph nine mandated they "shall immediately cease and desist [such] conduct . . . and forfeit the [c]ompensation [a]mount to [Marigold]," which "shall be entitled to seek . . . reimbursement of any [a]ttorney's fees accrued as a result of such breach."

Within three months of signing the Agreement, Tony began assisting co-defendant Rakesh Malhotra to open various M City Dollar stores. Rakesh had no prior experience in the dollar store industry. Testimonial and documentary evidence revealed that Tony provided Rakesh assistance in locating and securing retail leases, negotiating and purchasing inventory from vendors, picking up supplies and inventory, and attending trade shows. Three of Marigold's current vendors testified to working with Tony on behalf of M City Dollar. The physical

A-5849-17T3

evidence consisted of trade show badges, lease and purchase agreements signed by Tony, and Tony's tax returns.

Regarding the Agreement, Tony testified that he spoke and understood very little English; as a result, he denied understanding the nature of the Agreement. According to Tony, he understood the $120,000 payment represented the return of money he previously invested in the parties' business arrangement. He further claimed that Sam presented the Agreement with no advance notice and urged him to sign it the same day, without consulting an attorney. Tony insisted that he would not have signed the Agreement if he understood the restrictions it imposed. In fact, he claimed he first became aware of the restrictive covenant when served with Marigold's complaint.

Sam disputed most of Tony's testimony, testifying the parties negotiated the Agreement and that he suggested Tony present the Agreement to his attorney for review. He maintained Tony was eager to sign the Agreement and terminate their relationship.

Appellants testified that they struggled financially as a result of the Agreement. Tony claimed inability to find work outside the dollar store industry. Appellants maintained their only income was the $120,000 payout, liquidated college savings funds and insurance policies, and loans they claimed

to be receiving from family and friends. However, as noted in the trial judge's oral decision, appellants' tax returns, and their ability to pay the mortgage on their $565,000 home, undermined their claims of financial struggle.

During the presentation of appellants' case, Tony denied working for Rakesh and managing M City Dollar stores. He alleged that Sam committed theft when he issued himself various checks from the various dollar stores owned by appellants. However, on cross-examination, Tony was unable to present any evidence of Sam's alleged scheme. Tony also testified that he believed the Kassams used two finance companies, Fox Finance, Inc. and Ivory Factor, Inc., to perpetrate fraud. He testified that aside from his name appearing on Schedule K-1 tax forms, he knew nothing about how Sam managed the stores or handled all the paperwork.

On May 21, 2018, during the direct examination of Reshma by appellants' counsel concerning various assets and accounts listed in her name – about which she claimed to have no knowledge – the trial judge interjected to determine the relevance of the questioning. Counsel asserted the questioning related to appellants' defense and counterclaim for fraud. After allowing counsel to continue her examination, the judge again interrupted her after she questioned Reshma regarding the two finance companies. The judge instructed counsel to

stop questioning the witness about the finance companies, stating she should have investigated them during discovery.

After appellants' counsel spent several hours questioning first Reshma and then Sam, the trial judge asked counsel to provide the evidentiary basis for the Arumugams' counterclaims, "So, you have to now present some evidence. You can't just call [Sam] and start asking him questions to start proving your case. This is your case on the counterclaim." Finally, after the judge continued to question her lack of evidence, counsel raised the possibility of "dismiss[ing] our counterclaim and keep it in the other case so that way you don't have to deal with this[.]"

The next day, after speaking with her clients, appellants' counsel sought permission to withdraw the Arumugams' counterclaims "because a similar action is pending where [Sam] is individually named[.]" In response, the trial judge cautioned that "if you're dismissing the counterclaim against Marigold, . . . because the trial has started[,] prejudice attaches and it is with prejudice to asserting any other similar claims against Marigold." Counsel responded, "Yes, Your Honor. We will dismiss the counterclaim against Marigold in this case." The judge replied, "Okay. . . . the counterclaim is dismissed against . . . Marigold Management, Inc. with prejudice."

11

Following summations, the trial judge rendered his decision and delivered an oral opinion. In summarizing the conflicting testimony of the parties, the judge noted, "this case turns on the credibility of the . . . princip[al] parties[.]" Despite Sam's inability to recollect certain information accurately, the judge found him credible "in the material respects of the dispute, that is, the essence of [the Agreement] and what its terms were and what [Tony] was informed and agreed to[.]" He found Tony did not testify credibly, noting various inconsistencies in his testimony compared to other witness testimony; in addition, he rejected Tony's claimed inability to understand English. The judge found that "he spoke enough English to understand the basic business principles that were involved in his business. He understood leases and he had before him [the Agreement]. He understood it."

Regarding the Agreement's execution, the judge found,

> "[T]here's no question. I believe [Sam's] testimony that he told [Tony] go show it to your accountant and show it to your lawyer, and [Tony] said I don't have to show it [to] anybody, I know what it means, I – I'm – prepared to sign it, I – I want out, I want away, I – I want my money. And I find that [Sam] and [Tony] both clearly understood the terms of the separation agreement, it was negotiated in good faith, it was signed with the understanding."

12

The judge then cited the testimony of the vendors and the documentary evidence that supported his finding of appellants' breach of the Agreement.

> In sum, I find that [the Arumugams] knew the terms of [the Agreement], that they received adequate . . . and valuable consideration [in] the form of $120,000, that their testimony that they couldn't do any business and lived off the $120,000 and then were almost destitute is contradicted.  They had tens of thousands of dollars placed into their bank accounts [during] the calendar years of 2015 and [2016] and these were allegedly loans and gifts from friends and other relatives and other people.  I don't . . . find that to be credible.

The judge then addressed each count of the complaint in turn.  As to the breach of contract claim, without addressing the enforceability of the Agreement's restrictive covenant, the judge found appellants "knowingly violated the terms of the [A]greement by assisting, aiding and otherwise helping [M City Dollar] and [Malhotra] in the negotiation of leases, solicitation of vendors and placing orders and doing other management services for M City Dollar."  He found the Agreement unambiguous and that the $120,000 payment constituted valuable consideration.  He went on to describe Marigold's loss as "lost opportunities" and the loss of the $120,000.

The judge concluded Marigold failed to present sufficient evidence to establish a prima facie case for fraud.  Similarly, he found Marigold failed to

13

establish its claims for defamation, conversion, or tortious interference. He further found that Rakesh had no knowledge of the Agreement.

Turning to damages, the judge awarded Marigold $120,000 against appellants, jointly and severally, as compensation for the breach of the Agreement. In addition, he concluded that two paragraphs of the Agreement contemplated the award of attorney's fees. Accordingly, he directed counsel for Marigold to submit a certification of fees accrued. Marigold then filed a motion for attorney's fees and appellants filed a cross-motion to clarify the verdict.

On July 6, 2018, the trial judge ruled on the parties' cross-motions. In determining the award of attorney's fees, he analyzed the certification provided by Marigold's counsel and the applicable law. The judge concluded that although Marigold only succeeded on its breach of contract claim, the remaining claims "were really subsumed into that claim, and they didn't necessitate any additional legal services." Therefore, he found it unnecessary to allocate the award based on the success of each claim.

The judge determined the $250 hourly rate charged by Marigold's attorney "is not only reasonable, but is on the low side." He concluded the case was "complex and difficult" and that it required "considerable skill" to perform the required services. He further found "the lodestar was properly determined by

reasonable hours expended, times a reasonable hourly rate. And therefore I find that [Marigold] is entitled to recover all of its fees . . . ." The judge awarded Marigold $66,861 in attorney's fees, plus reasonable costs of $8875, for a total of $75,736. He denied appellants' cross-motion for clarification "because the [c]ourt's order was very clear when it was placed on the record on May 24."

Before the court entered the final judgment in Marigold I, on June 6, 2018, Marigold and the Kassams filed a motion for summary judgment in Marigold II. They argued appellants failed to state a claim for relief because the verdict in the first action barred the relief sought by them in the second "based on the entire controversy doctrine, res judicata, and collateral estoppel."

On July 9, 2018, appellants filed a cross-motion to amend their complaint in Marigold II, seeking leave to remove Marigold and add the two finance companies used by Sam and Marigold as defendants. Appellants attached a proposed amended complaint which alleged the Kassams were involved in a fraudulent scheme to "lure immigrants, low skill and low education individuals who often cannot speak English to enter into [a] business relationship with [them]" and open and close dollar stores in their names.

The proposed amended complaint claimed the dollar stores do not pay taxes and that the Kassams siphon money out of the stores. It further alleged

15

that the Kassams improperly used the finance companies to open bank accounts for the money taken from the various stores. The amended complaint included seven counts, alleging fraud, unjust enrichment, conversion, breach of contract, conspiracy, racketeering violations, and consumer fraud.

On July 20, 2018, the parties appeared before the trial judge on their respective motions. The judge first observed,

> The counterclaim was voluntarily dismissed because at the close of plaintiffs' case, I asked [] defendant[s] to proceed with [their] counterclaim. [They] then dismissed the counterclaim. They had no proof. They agreed to a voluntary dismissal of the counterclaim. The amended answer and counterclaim [in Marigold I] . . . and the complaint [in Marigold II] . . . are identical.

Counsel for appellants explained she filed Marigold II because the previous judge denied appellants' motion to amend their responsive pleading. Counsel further noted that the reconsideration decision only permitted appellants to amend their answer and counterclaim. Counsel asserted that appellants voluntarily dismissed their counterclaims with the understanding that they would be able to maintain their claims against the Kassams in Marigold II. The trial judge rejected this contention as "preposterous." He pointed out that "[Sam] was in [c]ourt. He was examined and cross[-]examined. His wife was

A-5849-17T3

in [c]ourt, examined and cross[-]examined. . . .  you can't try a case twice."  The judge further explained,

> There is absolutely nothing about this complaint that can survive a motion to dismiss.  It is res judicata.  It is, you are collaterally estopped, and the [e]ntire [c]ontroversy [d]octrine required that it be pled in [Marigold I], and it was pled in [Marigold I].  And this was just filed because, for some reason, the counterclaim at that point was not viable in [Marigold I].  And when it was, this should have been automatically dismissed, because it's the identical claim.  Dismissed with prejudice. Motion granted.

On August 14, 2018, the court entered two orders in Marigold II: 1) granting the summary judgment dismissal of the Arumugams' complaint against Marigold and the Kassams; and 2) denying the Arumugams' motion for leave to amend their complaint.

On September 28, 2018, the Arumugams filed appeals in both cases.  In their appeal in Marigold I, appellants contend the trial judge erred when he failed to address the enforceability of the Agreement's restrictive covenant, which they argue is unenforceable.  They also contend the court unreasonably awarded attorney's fees to Marigold.  In their appeal of Marigold II, appellants argue the judge erred when he denied their cross-motion for leave to amend their complaint and when he granted the summary judgment dismissal of their complaint against the Kassams.

A-5849-17T3

II

We first address the arguments raised in <u>Marigold I.</u>  Our review of a judge's verdict following a bench trial is limited.  Our standard of review requires that we uphold the trial judge's factual findings, provided they are "supported by adequate, substantial and credible evidence." <u>Rova Farms Resort, Inc., v. Investors Ins. Co.</u>, 65 N.J. 474, 484 (1974).  Thus, "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." <u>Seidman v. Clifton Sav. Bank, S.L.A.</u>, 205 N.J. 150, 169 (2011) (citations and internal quotation marks omitted).  Credibility determinations receive "particular deference," <u>RAB Performance Recoveries, LLC v. George</u>, 419 N.J. Super. 81, 86 (App. Div. 2011), because of the position of the trial judge to observe witnesses and hear them testify. <u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998); however, the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." <u>Manalapan Realty, L.P. v. Twp. Comm.</u>, 140 N.J. 366, 378, (1995).

Non-competition covenants, while enforceable, are scrutinized closely because they operate in derogation of free competition and the individual's right to exploit his or her skills and labor. A non-compete provision is not valid if its only purpose is to restrict competition, but it may be valid to the extent it furthers some other legitimate goal. See Solari Industries, Inc. v. Malady, 55 N.J. 571, 576 (1970); Whitmyer Bros. v. Doyle, 58 N.J. 25, 36 (1971). Courts considering non-compete covenants recognize that a business has a legitimate interest "in protecting trade secrets, confidential information, and customer relations." Campbell Soup Co. v. Desatnick, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (quoting Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 628 (1988)).

New Jersey courts have considered covenants not to compete executed in connection with an employment contract and those signed incident to the sale of a business. Restrictive covenants ancillary to an employment agreement are enforceable only insofar as they are reasonable under the circumstances. Solari, 55 N.J. at 576; Whitmyer, 58 N.J. at 32. In Solari, the Court enunciated a three-part standard for determining the enforceability of such covenants: 1) it must protect a legitimate interest of the employer; 2) it may impose no undue hardship on the employee; and 3) it must not impair the public interest. 55 N.J. at 585. Even if found to be enforceable, a covenant "may be limited in its application

concerning its geographical area, period of enforceability, or its scope of activity," sometimes referenced as the "blue pencil" rule. Coskey's T.V. & Radio Sales v. Foti, 253 N.J. Super. 626, 634 (App. Div. 1992) (citing Solari, 55 N.J. at 585).

As we recognized in ADP, LLC v. Kusins, 460 N.J. Super. 368, 402 (App. Div. 2019), after a court analyzes the relevant factors, a restrictive covenant may be given "total or partial enforcement to the extent reasonable under the circumstances." (quoting Whitmyer, 58 N.J. at 32). Our Supreme Court replaced a void per se rule in favor of a rule which allows courts to "limit or 'blue-pencil' the application of [a restrictive covenant] in terms of the geographical area, period of enforceability, and scope of prohibited activity." Id. (citing Solari, 55 N.J. at 585).

In contrast to restrictive covenants ancillary to an employment agreement, "covenants ancillary to the sale of a business are accorded far more latitude." Coskey's, 253 N.J. Super. at 633. Sound reasons explain the difference in treatment:

> [I]f a retail store is purchased at a particular location, the seller receives payment for the good will generated at that location, recognizing that customers would be inclined to continue shopping at the facility. See Heuer v. Rubin, 1 N.J. 251, 256 (1949). For the seller to thereafter trade on that good will by reopening within

20

the competitive area would destroy the essence of the transaction.

[Ibid.]

"[N]oncompetitive agreements . . . have a proper place and are enforceable under appropriate circumstances. Thus a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts." Solari, 55 N.J. at 576. "Nonetheless, courts, in examining sale[-]of[-]business non-competes, should perform the three[-]part Solari/Whitmyer test, albeit more flexibly." Laidlaw. Inc. v. Student Transp. of Am., 20 F. Supp. 2d 727, 754 (D.N.J. 1998). As noted in Jiffy Lube Int'l, Inc. v. Weiss Bros., 834 F. Supp. 683, 691 (D.N.J. 1993), "[N]otwithstanding the deference given to restrictive covenants made in connection with the sale of a business, there is no indication that New Jersey law denies to the court the right to 'blue pencil' such a covenant to insure that it is reasonably tailored to meet the Solari test . . . ." (citation omitted).

In this case, the trial judge did not perform the three-part Solari/Whitmyer test; instead, he analyzed Marigold's claim under a traditional breach of contract analysis. It appears the judge focused on Marigold's complaint, which sought damages for breach of contract, and did not seek prospective enforcement of the restrictions contained in the non-compete provision of the Agreement.

21

Given that the trial judge has since retired, we choose to exercise our original jurisdiction and complete the three-part Solari/Whitmyer analysis. R. 2:10-5 ("The appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review."). We choose to exercise original jurisdiction since the trial judge's factual findings and credibility determinations, along with the extensive trial record, provide an adequate basis for us to perform the three-part Solari/Whitmyer analysis.

The first requirement that must be met for a restrictive covenant to be enforceable is that it "simply protect the legitimate interests" of the covenantee. Traditionally, this has meant trade secrets, confidential business information, and customer relationships. Coskey's, 253 N.J. Super. at 636. In this case, given the nature of the Dollar Store business and the services provided by Marigold, we conclude that Marigold's vendor and landlord relationships constitute legitimate interests worthy of protection.

In their brief, appellants implicitly concede this case presents legitimate business interests worthy of protection. The Agreement prevents appellants from contacting Marigold's vendors and landlords for two years. Appellants do not challenge this restriction, presumably because they know it does protect Marigold's legitimate business interest in the Dollar Store industry.

22

As Marigold argues, and the record reflects,

> Dollar Store prices are low because they sell "closeout" items – lines of merchandise that larger stores discontinue and sell to Dollar Stores at low cost. Quantities are finite, but necessary for Dollar Stores to survive. Also, because of the nature of the business, Dollar Stores frequently fail and close soon after they open. This is why they have to have short term leases, which not all malls permit. That is why Marigold's relationship with its landlords and vendors is so important and distinguishable from those in the mainstream retail industry.

The Agreement also prohibits appellants from working for Dollar Stores within ten miles of the stores Marigold services. Appellants do challenge this restriction, but only insofar as the ten-mile restriction is concerned; however, the evidence shows that at least one of M City Dollar's stores was less than three miles from Marigold's stores. Therefore, the Agreement can be blue-penciled to make the geographic limitation three miles, effectively rendering this challenge moot. Similarly, since the record contains overwhelming evidence that Tony began violating the non-compete within three months of the Agreement – if not immediately – the Agreement can be blue-penciled to make the duration of the non-compete six months, instead of sixty months.

Appellants' main argument is that "Marigold is in no position to make any kinds of restrictions on [the Arumugams'] employment because Marigold and

23

[the Arumugams] have no discernable relationship with one another." This argument ignores Tony's admitted long-term business relationship with Sam, and appellants' own assertion, in its amended counterclaim, that "there is no distinction between [Sam] and Marigold."

Appellants also argue that Marigold had no legitimate business interests at all in 2015 (when the noncompete Agreement was executed) because it reported no net income that year; however, as Marigold notes, the reason it showed no income is because it distributed its income.

Significantly, the covenants here were purchased, not just nominally, but for $120,000. While Tony made a general claim that he was owed significant sums from his business relationship with Sam, appellants presented no credible testimony or documentary evidence to support their claim. We agree with Marigold that the record demonstrates the covenants served a legitimate business purpose, especially considering the significant sum of money paid as consideration for them, following good faith business negotiations.

To be enforceable, the covenants in the Agreement must also not impose undue hardship on the covenantors. Karlin v. Weinberg, 77 N.J. 408, 423 (N.J. 1978). For a court to find undue hardship, a particular non-competition restriction must result in more than mere "personal hardship." Id. at 424. The

inquiry should look to the "likelihood of the employee finding work in his [or her] field elsewhere." Id. at 423. Where the breach results from the covenanters' own conduct, "rather than from any wrongdoing by the [covenantee], a court should be hesitant to find undue hardship . . . ." Id. at 424.

The question of hardship focuses on the adverse impact that compliance with the covenant will have. Here, the record contains no credible evidence of compliance, and Marigold does not seek prospective compliance. Moreover, the two-year prohibition against contact with vendors and landlords in Paragraph 8 of the Agreement expired long ago. And the five-year covenant not to compete in Paragraph 3 expired earlier this year. Regardless, as previously noted, it can be "blue-penciled" down to six months. Thus, we agree with Marigold that the hardship question is moot because appellants never complied with the covenants and will never have to comply. Any hardship that appellants experienced was self-imposed. Requiring appellants to repay the $120,000 they were paid as consideration for the non-compete covenant they failed to honor, does not constitute undue hardship.

The third requirement for an enforceable restrictive covenant is that it not be "injurious to the public." The Arumugams do not argue this point. Since Marigold did not seek prospective enforcement of the promises in its restrictive

covenant, only the return of the money it paid for the covenant, enforcement limited to compensating Marigold for past non-compliance would not injure the public. Where a case presents "no major public component," no "extended discussion" is required. Coskey's, 253 N.J. Super. at 793. We further note that the non-compete provision at issue here is part of a private contract between parties of equal bargaining power. No employer-employee relationship existed between Marigold and the Arumugams.

Here, the issue is the computation of damages for breach of the non-compete clause. In Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1 (2007), the Court set forth the principles that inform any award of contract damages. As a threshold matter, it explains that "judicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance." Id. at 12 (citation and internal quotation marks omitted). The Court noted that

> [e]ach of these contract remedies serves a different purpose. Restitution returns the innocent party to the condition he or she occupied before the contract was executed. Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed. Performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement.

[Id. at 12-13 (citation omitted).]

We conclude that the court applied the proper legal standard by awarding the $120,000 Marigold previously paid as the amount of compensatory damages. As to the court's factual findings of the amount of the compensatory damages, there is sufficient credible evidence in the record to support its finding.

Regarding counsel fees and costs, we review such determinations of the trial court for a clear abuse of discretion and will disturb that determination "only on the rarest of occasions[.]" Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009) (quoting Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 444 (2001)). A prevailing party may only seek attorney's fees "if they are expressly provided for by statute, court rule, or contract." Id. at 385 (quoting Packard-Bamberger, 167 N.J. at 440).

The trial judge noted the Agreement specifically provided for the award of attorney's fees to Marigold in the event the Arumugams breached the Agreement. He concluded Marigold was successful on the merits as the breach-of-contract issue dominated the entirety of the ten-day bench trial. Furthermore, he reviewed counsel's certification on the record and found "[f]or each item there was a date of service, a description of the services provided, the amount of time broken down into tenths of [an] hour, and the hourly rate, which was $250 per

hour . . . ." The judge also analyzed the RPC 1.5(a) factors and determined that Marigold was entitled to recover all of its fees. We find no basis to disturb the award in this case.

III

We next turn to the arguments raised in the appeal of the Marigold II dismissal order. The Arumugams contend the judge erred in granting summary judgment in favor of Marigold and the Kassams as the doctrines of res judicata, collateral estoppel, and entire controversy did not apply. They argue they were denied a fair and full opportunity to litigate the issues in the first action. We disagree.

We review a trial court's decision granting summary judgment de novo, using the same standard the trial court applied. Townsend v. Pierre, 221 N.J. 36, 59 (2015) (citing Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014)). A court should grant summary judgment if the record establishes there is "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would

require submission of the issue to the trier of fact.'"  Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).  "If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).  We also review the trial court's legal conclusions de novo.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The claims the Arumugams asserted in Marigold II are identical to the counterclaims they brought in Marigold I.  The facts alleged in Marigold II are nearly identical to the counterclaim facts alleged in Marigold I.  The only difference between the two pleadings are paragraphs 50-55 in Marigold II complaint, which allege facts to support an unjust enrichment claim against Reshma; otherwise, the two pleadings contain identical factual allegations.  In addition, both pleadings assert identical causes of action.

Under the doctrine of res judicata, a "cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding."

Velasquez v. Franz, 123 N.J. 498, 505 (1991). New Jersey law requires three basic elements for res judicata to apply:

> (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.
>
> [Watkins v. Resorts Int'l Hotel & Casino, 124 N.J. 398, 412 (1991).]

It is well settled that a "judgment of involuntary dismissal or a dismissal with prejudice constitutes an adjudication on the merits 'as fully and completely as if the order had been entered after trial.'" Velasquez, 123 N.J. at 507 (quoting Gambocz v. Yelencsics, 468 F.2d 837 (3d Cir. 1972)).

In both cases under review, appellants sued Marigold for fraud, unjust enrichment, conversion, and breach of contract. In both cases, they alleged the same facts as the basis for each cause of action. Clearly, the second and third requirements are satisfied. Regarding the first requirement, appellants' voluntary dismissal of their counterclaims in Marigold I operates as a final judgment on the merits. See Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345 (2d Cir. 1995) ("A voluntary dismissal with prejudice is an adjudication on the merits for purposes of res judicata.")

Appellants argue they moved to dismiss their counterclaims in the Marigold I because the trial judge "continually refused to hear evidence relevant to their counterclaim . . . . "  While the trial judge expressed frustration with what he perceived as a lack of trial preparation, the record does not support the contention he refused to hear or receive relevant evidence.  Even if the record supported this contention, we nevertheless reject the argument that this alleged unadjudicated claim could be pursued in a separate lawsuit.  If the trial judge refused to hear relevant evidence, then it was incumbent on counsel to attempt to present all relevant evidence to the trial judge, thereby creating an appropriate record,  and if the judge refused to hear the evidence, to pursue an appeal regarding the scope of the judgment that had been entered in that action.  Appellants did not have the luxury of simply dismissing their counterclaim in order to pursue this alleged unadjudicated claim in another pending lawsuit.

Clearly, the entire controversy doctrine does not permit such serial lawsuits. To the contrary, the entire controversy doctrine was devised as a means of promoting judicial economy and fairness to the parties; the doctrine requires that, whenever possible, a party should assert all claims arising from the same set of facts in a single lawsuit.  Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc., 150 N.J. 489, 496 (1997).  To the extent that the Arumugams

argue the judge erred in <u>Marigold I</u> by refusing to hear evidence relevant to their counterclaim, it obviously is inappropriate for them to attempt to pursue those arguments in <u>Marigold II</u>, rather than by way of an appeal of those rulings in <u>Marigold I</u>.

Res judicata also precludes appellants' claims against the Kassams in <u>Marigold II</u>. Res judicata applies not only to parties in a prior lawsuit, but also to those in privity with them. <u>Township of Washington v. Gould</u>, 39 N.J. 527, 533 (1963) ("It is well-settled that where a judgment of a court of competent jurisdiction directly determines a right, question or fact distinctly put in issue, such judgment estops the parties or their privies from thereafter relitigating the same issue in a subsequent proceeding between them, regardless of its nature or form).

Appellants concede Sam is the sole owner and officer of Marigold and that he makes its decisions. They further allege that the interests of Sam and Marigold are so aligned to make them alter egos (hence the pierce-the-corporate-veil claim in both cases). Sam is therefore in privity with Marigold for res judicata purposes, because the claims against him here are identical to those against Marigold in <u>Marigold I</u>. For that reason, summary judgment in his favor was proper. <u>See</u> <u>Henry v. Farmer City State Bank</u>, 808 F.2d 1228, 1235 n.6 (7th

32

Cir. 1986) ("The doctrine of res judicata operates to bar the RICO claims against all of the defendants. Even though the Bank was the only actual party to the state court mortgage foreclosure proceedings, the other defendants, as directors, officers, employees, and attorneys of the Bank, are in privity with the Bank for purposes of res judicata.").

In addition, we conclude the entire controversy doctrine precludes appellants' claims against both Sam and Reshma. "[T]he entire controversy doctrine seeks to assure that all aspects of a legal dispute occur in a single lawsuit. The goals of the doctrine are to promote judicial efficiency, ensure fairness to all parties with a material interest in an action, and encourage the conclusive determination of a legal controversy." Olds v. Donnelly, 150 N.J. 424, 431 (N.J. 1997).

The doctrine applies not only to claims but to parties as well. Id. (holding entire controversy doctrine "requires that parties should present all affirmative claims and defenses arising out of a controversy," and also "requires the mandatory joinder of all parties with a material interest in a controversy.").

In considering the application of the entire controversy doctrine,

> courts are to be guided by the general principle that all claims arising from a particular transaction or occurrence should be joined in a single action. . . . That mandate encompasses not only matters actually

litigated but also other aspects of a controversy that might have been litigated and thereby decided in an earlier action. . . . Ultimately, it is for the trial court to determine whether or not joinder is appropriate in a given case, and thus litigants should be compelled to bring all actions at one time, with the understanding that trial judges are empowered, once all claims are joined, to segregate different claims to assure manageability, clarity and fairness.

[Higgins v. Thurber, 413 N.J. Super. 1, 12 (App. Div. 2010), (internal citations and quotations omitted).]

In January 2016, Marigold filed its complaint in Marigold I and appellants filed their answer and counterclaims in March 2016. More than a year-and-a-half later, on September 27, 2017, appellants filed a motion in Marigold I for leave: 1) to amend their answer; 2) to assert additional counterclaims against Marigold; and 3) to file a third-party complaint against Sam and Reshma. The court denied the motion because appellants failed to submit Sam's deposition testimony.

Because their motion was denied, appellants filed Marigold II, naming Marigold, Sam, and Reshma as defendants. Two weeks later, on November 16, 2017, appellants filed a motion to reconsider in Marigold I. In support, they again included their attorney's certification and this time included Sam's deposition transcript. However, they only sought reconsideration of the ruling denying the request to amend their answer and add new counterclaims – they

34

did not seek reconsideration of the ruling denying their request to file a third-party complaint against Sam and Reshma.  Nevertheless, they did acknowledge consolidation of  Marigold II with Marigold I was necessary, stating: "At this time, [the Arumugams] seek to file only [an amended] [a]nswer and [c]ounterclaim as, due to [the] [c]ourt's decision, a separate complaint against [Sam] has been filed and the [the Arumugams] will seek to consolidate." Appellants' motion to reconsider was granted, and on January 29, 2018, they filed their amended answer and counterclaim in Marigold I.

Notwithstanding their stated intentions, appellants never sought to consolidate Marigold I and Marigold II.  As a result, Marigold did; however, appellants inexplicably opposed consolidation.  Ultimately, the court denied Marigold's motion to consolidate.  Appellants' brief failed to acknowledge the motion to consolidate or provide any explanation for their opposition to Marigold's consolidation motion.  Marigold argues that appellants opposed the motion "because they wanted to keep the two cases separate."  In the absence of any other explanation, we conclude that Marigold's assertion is likely correct and weighs heavily against the non-application of the entire controversy doctrine.  We agree with Marigold that the court would have likely granted the consolidation motion, if unopposed, "given the complete overlap between the

35

[two cases]." Given the procedural history described, the goals of the entire controversy would be severely undermined if appellants were permitted to pursue Marigold II at this point.

Regarding appellants' belated motion to file an amended complaint in Marigold II, the judge did not abuse his discretion in denying appellants' motion. At that point, Marigold II was subject to dismissal, as noted, on multiple grounds. A proposed amendment should be denied when it is futile. See Mustilli v. Mustilli, 287 N.J. Super. 605, 607 (Ch. Div.1995).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5849-17T3