**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0257-19

PROTECTED GOALS, LLC,
NEW CENTURY CAPITAL
MANAGEMENT, LLC, and
MURRAY WOLOSHIN,

  Plaintiffs-Respondents,

v.

LOUIS TERRERO,

  Defendant-Respondent,
and

SONIA LUGO, LISA RYERSON,
TRINITY WW TECHNOLOGIES,
ZENITH MARKETING,
APPLEWOOD ASSET
MANAGEMENT, LLC, NEW
CENTURY IDENTITY THEFT
PROTECTION SERVICES, LLC,
and NEW CENTURY PLANNING
ASSOCIATES, INC.,

  Defendants,

and

ROBERT RYERSON,

Defendant-Appellant.

_____

Argued June 7, 2022 – Decided June 29, 2022

Before Judges Sumners, Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000231-16.

Robert Ryerson[1] appellant argued the cause pro se (Matthew D. Rasmussen and Robert Ryerson, on the briefs).

Jay J. Rice argued the cause for respondents (Nagel Rice, LLP, attorneys; Jay J. Rice, of counsel and on the brief; Michael J. Paragano, on the brief)

PER CURIAM

Robert Ryerson appeals from a September 9, 2019 final amended judgment entered by the Law Division following a bench trial awarding

---

[1] On May 12, 2022, we granted defendants Louis Terrero and Robert Ryerson's motions to represent themselves on appeal due to the suspension of their attorney. Additionally, we dismissed the appeal as to defendants New Century Planning Associates, Inc. (NCP), New Century Identity Theft Protection Services, LLC (NCI), and Applewood Asset Management, LLC (Applewood) because new corporate counsel was not retained to represent them. Terrero is listed on the counseled brief but stated during oral argument he has not appealed. Claims against Lisa Ryerson (also known as Lisa Lieb) and Sonia Lugo were dismissed with prejudice. Plaintiffs' claims against Trinity WW Technologies (Trinity) and Zenith Marketing were settled prior to trial. In this opinion, we refer to Robert Ryerson as Ryerson.

plaintiffs Protected Goals, LLC (Protected), New Century Capital Management, LLC (NCCM), and Murray Woloshin (collectively plaintiffs) compensatory damages against defendants in the sum of $226,404.26 and $17,559.25 in prejudgment interest for defendants' breach of contract, tortious interference with contract, common law breach of the duty of loyalty, unfair competition, and fraud. The trial court also awarded $277,069.81 in counsel fees. Ryerson and NCP were liable for the entire counsel fee amount, while Terrero, Applewood and NCI were responsible for $76,064 of the counsel fee award. In addition, the judgment also enjoined defendants from violating Ryerson's restrictive covenant with plaintiffs until December 31, 2019, and ordered NCI to return certain sales agreements and publications. After carefully reviewing the record and considering the applicable legal principles, we affirm the compensatory damage awards but reverse and remand the counsel fee awards because the trial court did not conduct a thorough review of each factor set forth in RPC 1.5(a).

I.

We derive the following facts from the extensive five-day trial record. Woloshin is an experienced registered investment advisor (RIA) and insurance agent, providing planning and financial services. Ryerson was an RIA until the

3

National Association of Securities Dealers (NASD) found him guilty of misconduct in 2006 by sharing commissions with a non-NASD member and intentionally engaging in conduct designed to mislead his employer. While still an RIA, Ryerson owned and operated NCP, a small financial advisory firm. Ryerson's RIA revocation meant he could neither manage client assets nor sell insurance products.

Because Ryerson could not service his clients, he sought a mutually agreeable buy-sell agreement with Woloshin, the president of NCCM and Protected, which required approval from the New Jersey Bureau of Securities (NJBS). In order to comply with applicable regulations, NJBS required that Woloshin "purchase all of NCP's assets and take control over all of NCP's accounts, present or prospective." Consequently, in 2008, Woloshin formed NCCM to absorb and take over Ryerson's business. Initially, NCCM was created as an investment advisory firm to secure regulated and non-regulated businesses. To effectuate this relationship, the parties entered into three separate agreements, ("the agreements"), on February 28, 2008.

A. The Asset Purchase Agreement

Under the terms of the Asset Purchase Agreement (APA), NCP sold NCCM all "rights to provide investment management services to [NCP] clients,"

A-0257-19

"[NCP]'s book of business, including, without limitation, all of [NCP]'s right, title and interest in and to . . . all Client accounts . . . maintained by [NCP]," and NCP's records and client files. NCCM paid NCP a base price of $250,000 with adjustable metrics allowing for a maximum payment of $700,000. The last payment under the APA was due four years from the date of execution.

B. The Non-Compete and Consulting Agreement

While Ryerson sold all NCP assets to NCCM under the APA, Woloshin also brought Ryerson on as a consultant. Under the terms of the Non-Compete and Consulting Agreement (Consulting Agreement), it was contemplated Ryerson would facilitate the transfer of NCP clients to NCCM, perform general economic analysis as requested, and conduct other non-investment advisory work at the request of NCCM. The Consulting Agreement specifically prohibited Ryerson from "performing any investment advisory work" or contacting NCCM clients in any way on behalf of NCCM "except for introductory meetings."

The Consulting Agreement also required Ryerson to "maintain the confidentiality and privacy of all" NCCM client information. Ryerson also agreed not to:

> discard, delete, alter or modify any correspondence
> (hard copy or electronic) sent or received by you as a

A-0257-19

> Consultant of [NCCM] unless in accordance with [NCCM]'s policies and procedures[; or] . . . <u>solicit clients or prospective clients of [NCCM] for any purpose</u>, including to modify or terminate their relationship with [NCCM], <u>or to become clients of some other company or entity that competes in any way with [NCCM]</u>, nor to sell them any products or services, <u>nor cooperate in any way with any third-party in the sale of products or services, that might in any broad sense compete with [NCCM]</u>.
>
> [(Emphases added).]

These prohibitions were to "survive . . . one year past <u>the later of</u> the end of the term [Ryerson was to] serve as a Consultant to [NCCM], or end of the [APA] between [NCCM] and NCP." (Emphasis added).

The Consulting Agreement further provided that in the event NCCM or any affiliated persons became a party to any legal proceeding or suffered any damages as a result of any act or omission by Ryerson, he agreed to "defend, indemnify and hold harmless [NCCM], its officers, members, employees and/or agents, from any and all settlements, judgments, awards, attorneys['] fees and costs." In addition, the Consulting Agreement indicated that Ryerson "agree[d] to execute the corresponding Confidentiality and Restrictive Covenant Agreement in the form presented . . . by [NCCM]."

C. <u>The Confidentiality and Restrictive Covenant Agreement</u>

6

Under the terms of the Confidentiality and Restrictive Covenant Agreement (Restrictive Covenant), Ryerson agreed "to protect [NCCM]'s legitimate interests in its client relationships[] and the confidential information that [NCCM] has developed about its clients," and all NCCM client data was and would remain proprietary to NCCM during and subsequent to any termination of Ryerson's employment "and forever thereafter," even if he introduced clients to NCCM. Additionally, Ryerson "agree[d] not to use, communicate, reveal, or otherwise make available" any confidential client information "except solely and exclusively in furtherance of [his] employment" with NCCM. Ryerson was also prohibited from removing any records from company offices without express permission.

"In recognition of the highly confidential and proprietary nature of [NCCM]'s business methods and practices," Ryerson agreed not to solicit business from:

> (i) any person or entity who is a[n] [NCCM] client . . . at the inception of [Ryerson's] employment/association, or becomes a[n] [NCCM] client . . . during the term of [Ryerson's] employment/association . . . or (ii) any person or entity identified as a prospective [NCCM] client (i.e., any and all individuals or entities identified and/or contacted by [or who contacts] the Company for the purpose of becoming a[n] [NCCM] client within the [twenty-four] month period prior to the termination of [Ryerson's] employment/association) . . . .

[(Eleventh alteration in original).]

On the last page of the Restrictive Covenant, paragraph seven reads:

> [I]n the event that I violate or threaten to violate any of the above covenants or restrictions, [NCCM] . . . shall be entitled to both: (a) to a preliminary or permanent injunction in order to prevent the continuation of such harm; and (b) money damages, insofar as they can be reasonably determined, including, without limitation, all reasonable costs and attorneys' fees incurred by [NCCM] in enforcing the provisions of this Agreement.

[(Emphasis added).]

These restrictions would last for a two-year period "subsequent to termination of [Ryerson's] employment/association for any reason."

D. Ryerson's Departure from NCCM

After signing the agreements, Ryerson remained a consultant with NCCM for eight years under Woloshin's direction. Woloshin handled any business originated by Ryerson. During that time, Woloshin, on the advice of his attorneys, separated NCCM's operations and formed Protected in 2015 to handle the non-regulated portion of the business. Towards the end of 2015, Ryerson devised a plan to siphon clients away from NCCM and disparaged Woloshin. Because Ryerson had still not regained his RIA license and could not act as a broker or obtain errors and omissions insurance, plaintiffs asserted he needed a

strawperson who could obtain an RIA, or the requisite licenses, to sell insurance products. To that end, Ryerson persuaded Terrero, a certified public accountant, to become licensed in order to sell NCCM products. Ryerson and Terrero formed Applewood in December 2015 for that purpose.

Plaintiffs contend Ryerson began secretly forwarding client data to Terrero between May and August 2016, while still working for NCCM. This included sales leads, NCCM client lists, mailing lists, client asset and account information, and "outside business spreadsheets." At Ryerson's direction, Terrero copied NCCM documents in case Woloshin wanted the original documents returned. Original insurance and annuity files were taken from NCCM's office.

Ryerson also directed an unaffiliated outside vendor, Trinity, to download NCCM data and upload it to NCP's cloud. Ryerson then initiated a Comcast work order to transfer all of NCCM's business telephone numbers, sold by NCP in the APA, back to Ryerson without Woloshin's knowledge or approval. Ryerson and Terrero conspired to obtain NCCM clients through Applewood and another entity, NCI. On August 22, 2016, Ryerson and Terrero formally terminated their association with NCCM by moving out of Woloshin's office and taking his clients' electronic and hard copy files with them.

A-0257-19

Woloshin asserted Ryerson and Terrero stole personal client information—names, addresses and the types of products they purchased in the past. After their departure, Ryerson and Terrero continued to solicit Woloshin and NCCM's clients using the stolen information. On October 20, 2016, plaintiffs filed a verified complaint and order to show cause (OTSC) seeking injunctive relief against Terrero, Lugo, Lisa Ryerson, Trinity, Zenith, Applewood, and NCP. In their complaint, plaintiffs alleged defendants aided and abetted Ryerson "to engage in unfair competition and tortiously pilfer plaintiff[s'] clients." The complaint alleged tortious interference with contract (count one); tortious inducement of a breach of the fiduciary duty of loyalty (count two); and unfair competition (count three). Plaintiffs also sought punitive damages and counsel fees.

On November 3, 2016, the trial court entered the OTSC. On December 23, 2016, the court entered an order granting plaintiffs' request for injunctive relief and enjoined and restrained defendants "from using or disclosing any of [p]laintiffs' confidential information."

Due to Terrero and Applewood's repeated violations of the court's order, a second OTSC was entered by the court on January 23, 2017. On February 13, 2017, plaintiffs filed a verified amended complaint to add NCP as a defendant.

10

On February 16, 2017, Jeffrey Malatesta, Esq., former counsel for Terrero and Applewood, wrote a letter to the court withdrawing previous correspondence he submitted as "not accurate." At his deposition, Malatesta testified Ryerson and Terrero admitted to violating the court's December 23, 2016 order and soliciting NCCM clients. On March 2, 2017, the trial court denied plaintiffs' application to hold these defendants in contempt but ordered them to comply with the December 23, 2016 order. The court also directed Comcast, the utility provider for defendants, to transfer certain phone numbers from defendants and back to plaintiffs.

On March 7, 2017, plaintiffs filed a second amended complaint to add Ryerson as a defendant. On March 30, 2017, the court granted plaintiffs' application for injunctive relief against NCP and Ryerson. Following a period of discovery, on February 20, 2018, plaintiffs filed a third amended complaint to include additional counts for breach of contract, defamation, and fraud. Zenith moved for summary judgment to dismiss plaintiffs' allegations against it with prejudice. On April 24, 2018, the court granted Zenith's motion in part and dismissed counts two, tortious interference with contract, and four, unfair competition, against it.

A-0257-19

At trial, Woloshin testified that Ryerson persuaded virtually all of NCCM's clients to leave NCCM. Plaintiffs also presented expert testimony from Philip C. Kempisty, CPA. Kempisty testified he was able to identify forty-seven NCCM clients who terminated their relationship with NCCM—twenty-nine of those clients commenced their relationship with NCP before the sale to NCCM. Based upon a formula on "mutually agreed value" utilized by Woloshin and Ryerson, initial maximum purchase paid amounts, lost commissions, and other variables, Kempisty testified plaintiffs' damages totaled $553,609. Kempistry opined Ryerson and Terrero worked in unison "for a common purpose," which included "shared revenue," "shared office resources," and "shared client and prospect lists taken from NCCM and Protected."

Ryerson did not proffer expert testimony at trial, and thus Kempisty's opinions were uncontroverted. Plaintiffs called Ryerson as a witness in their case-in-chief. He acknowledged under the terms of the APA he was required to maintain confidentiality of NCCM's clients, its employers, contractors, and associates; he would not modify documents without prior approval; and he would not solicit clients or interfere with existing employees, contractors or associates. Ryerson testified he did not recall signing the confidentiality and restrictive covenant agreement and could not find the document.

12

Ryerson also testified Applewood was formed on December 24, 2015, with his wife Lisa Lieb and Terrero, but he claimed it was Terrero's business. Ryerson thought he was underpaid and should sever ties with Woloshin in August 2016. Admittedly, Ryerson started a competing financial advisory firm under his belief that he was not subject to any restrictive covenants.

Terrero, Malatesta, Lisa Ryerson, Lugo, and Peter Colicchia, an NCCM employee, testified at trial. Colicchia testified Ryerson mentioned to him that he was planning to quit "pretty much on a daily basis" and Colicchia was responsible to find a new location for NCCM. Ryerson told Colicchia "he was doing some backup" to the server in case anything was lost in the move. On the last day of trial, July 25, 2018, the court reserved decision.

On April 2, 2019, the court rendered its oral decision. The court found Ryerson signed the APA and the Consulting Agreement on February 28, 2018. By clear and convincing evidence, the court found Ryerson also signed the Restrictive Covenant based upon the "totality of the circumstances" and "conduct of the parties over the period of eight years." The court highlighted the Non-Compete Agreement signed by Woloshin and Ryerson "contained a provision by which Mr. Ryerson agreed to sign the [R]estrictive [C]ovenant." In addition, the court determined Woloshin was "a very credible witness"

13

particularly "in light of the history of the relationship." Woloshin testified Ryerson "definitely" signed the Restrictive Covenant because NJBS "needed that document to be signed." And, Ryerson "didn't deny that he signed it."

The trial court emphasized Ryerson agreed to a two-year period after his termination from NCCM not to solicit its clients directly or indirectly. The court noted the Restrictive Covenant was "limited in scope" and could only be read one way—rejecting Ryerson's argument that the two-year period started to run after the APA expired. And, the court stressed the "[v]ery plain language" contained in the Restrictive Covenant, was written by Ryerson's attorney. The court found the three agreements were "reasonable" and entered "between two commercial sophisticated parties."

In its conclusion, the court found plaintiffs prevailed on all counts of their second amended complaint except the defamation claim. A memorializing order was entered. On August 27, 2019, the court clarified its previous oral decision and found Ryerson, Terrero, NCP, Applewood, and NCI jointly and severally liable for the sum of $226,404.26 in compensatory damages and $17,559.25 in prejudgment interest. The court also awarded plaintiffs counsel fees incurred for the duration of the case; Ryerson and NCP were liable for the entire

$277,069.81 amount; Terrero, Applewood, and NCI were liable for $76,064 of that amount. A final amended judgment was entered.

On appeal, Ryerson raises the following points in his counseled brief:

I. THE TRIAL COURT ERRED IN CONFERRING RESTRICTIVE COVENANTS AGAINST DEFENDANT RYERSON IN RELATION TO SOLICITING PLAINTIFF[S]. (Raised below).

II. THE TRIAL COURT ERRED IN FAILING TO REDUCE THE COMPENSATORY AWARD GIVEN TO PLAINTIFFS BY THE ONGOING COST OF DOING BUSINESS, THEREBY ALLOWING PLAINTIFF[S] A WINDFALL OR OTHERWISE MISCALCULATED THE COMPENSATORY DAMAGES AWARD BY MISCONSTRUING NET AND GROSS REVENUES. (Raised below).

III. THE TRIAL COURT ERRED IN FAILING TO REDUCE ATTORNEY'S FEES ASSOCIATED WITH THE PROSECUTION OF PLAINTIFF[S'] CASE. (Raised below).

In his pro se supplemental reply letter brief, Ryerson failed to comply with Rules 2:6-5 and 2:6-(6) by not providing point headings delineating his legal arguments. And, for the first time on appeal, Ryerson raises a new argument: the trial court did not have subject matter jurisdiction because plaintiffs' "proper legal remedy was binding arbitration in NYC." Procedurally, a party is not permitted to raise new or expended arguments in a reply brief. Pannucci v.

15

Edgewood Park Senior Hous. - Phase 1, LLC, 465 N.J. Super. 403, 410-11 (App. Div. 2020) (citing State v. Smith, 55 N.J. 476, 488 (1970)) (stating a party is not permitted to use a reply brief to enlarge the main argument or to advance a new argument); see also Borough of Berlin v. Remington & Vernick Eng'rs., 337 N.J. Super. 590, 596 (App. Div. 2001) ("Raising an issue for the first time in a reply brief is improper."). Thus, we deem the issues raised in Ryerson's supplemental letter reply brief to be waived.

II.

We first address the argument raised about the validity of the Restrictive Covenant. Appellate review of a judge's decision following a bench trial is limited. Our standard of review requires that we uphold the trial judge's factual findings, provided they are "supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974). Thus, "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)).

16

Credibility determinations receive "particular deference," <u>RAB Performance Recoveries, LLC v. George</u>, 419 N.J. Super. 81, 86 (App. Div. 2011), because of the position of the trial judge to observe witnesses and hear them testify, <u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998). However, the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." <u>Manalapan Realty, L.P. v. Comm. of Manalapan</u>, 140 N.J. 366, 378, (1995).

Non-competition covenants, while enforceable, are scrutinized closely because they operate in derogation of free competition and the individual's right to exploit his or her skills and labor. A non-compete provision is not valid if its only purpose is to restrict competition, but it may be valid to the extent it furthers some other legitimate goal. <u>See</u> <u>Solari Indus., Inc. v. Malady</u>, 55 N.J. 571, 576 (1970); <u>Whitmyer Bros. v. Doyle</u>, 58 N.J. 25, 36 (1971). Courts considering non-compete covenants recognize that a business has a legitimate interest "in protecting trade secrets, confidential information, and customer relations." <u>Campbell Soup Co. v. Desatnick</u>, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (quoting <u>Ingersoll-Rand Co. v. Ciavatta</u>, 110 N.J. 609, 628 (1988)).

New Jersey courts have considered covenants not to compete executed in connection with an employment contract and those signed incident to the sale of

a business. Restrictive covenants ancillary to an employment agreement are enforceable only insofar as they are reasonable under the circumstances. Solari, 55 N.J. at 576; Whitmyer, 58 N.J. at 32. In Solari, the Court enunciated a three-part standard for determining the enforceability of such covenants: (1) it must protect an employer's legitimate interest; (2) it may not impose an undue hardship on the employee; and (3) it must not harm public interest. 55 N.J. at 576. Even if found to be enforceable, a covenant "may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity," sometimes referenced as the "blue pencil" rule. Coskey's T.V. & Radio Sales & Serv. v. Foti, 253 N.J. Super. 626, 634 (App. Div. 1992) (citing Solari, 55 N.J. at 585).

As we recognized in ADP, LLC v. Kusins, 460 N.J. Super. 368, 402 (App. Div. 2019), after a court analyzes the relevant factors, a restrictive covenant may be "given 'total or partial enforcement to the extent reasonable under the circumstances.'" (quoting Whitmyer, 58 N.J. at 32). Our Supreme Court replaced a void per se rule in favor of a rule which allows courts to "limit or 'blue-pencil' the application of [a restrictive covenant] in terms of the geographical area, period of enforceability, and scope of prohibited activity." Ibid.

In contrast to restrictive covenants ancillary to an employment agreement, "covenants ancillary to the sale of a business are accorded far more latitude." Coskey's, 253 N.J. Super. at 633. Sound reasons explain the difference in treatment:

> [I]f a retail store is purchased at a particular location, the seller receives payment for the good will generated at that location, recognizing that customers would be inclined to continue shopping at the facility. See Heuer v. Rubin, 1 N.J. 251, 256 (1949). For the seller to thereafter trade on that good will by reopening within the competitive area would destroy the essence of the transaction.
>
> [Ibid.]

"[N]oncompetitive agreements . . . have a proper place and are enforceable under appropriate circumstances. Thus[,] a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts." Solari, 55 N.J. at 576.

Ryerson argues that because plaintiffs could not produce a signed copy of the Restrictive Covenant, he is not bound by it. And even if enforceable, the Restrictive Covenant is overly broad to the extent it prevents soliciting "prospective customers." Ryerson further asserts that NCCM's failure to assign the agreements to Protected indicates he had no contractual relationship with Protected and thereby, the damage award should be reduced. In addition,

19

Ryerson contends that because the APA expired in 2012, any restriction could not have been ancillary to the sale of a business. We disagree.

Ryerson cites Leodori v. CIGNA Corp., 175 N.J. 293, 305 (2003), for the principle that omission of one's "signature is a significant factor in determining whether the two parties reached an agreement." However, the very next sentence in Leodori clarifies that a party may still be bound when "some other explicit indication that the employee intended to abide by that provision" exists. Ibid. Here, the trial court detailed that such indications abound. Ryerson offers no countervailing facts that would cause us to reverse this finding. Moreover, Ryerson ignores the fact the underlying transaction was subject to NJBS approval; the Restrictive Covenant had to be signed; and Woloshin "credibly testified" Ryerson signed it. The record supports the trial court's decision.

Ryerson also argues he "[e]arnestly believe[ed] that he was not subject to any restrictive covenants." Throughout the litigation, and reiterated on appeal, Ryerson maintains the Restrictive Covenant expired at the same time as the APA—in February 2012. Again, we disagree.

The restrictions on solicitation of NCCM clients contained in the consulting agreement were to "survive the one year past the later of the end of the term [Ryerson] serve[s] as a [c]onsultant to [NCCM], or [the] end of the

20

[APA]."  In the face of this language, Ryerson maintains the prohibition terminated with the expiration of payments under the APA.  The trial court explained:

> These restrictions remained in effect for the latter of one year after the termination of . . . Ryerson's consulting relationship with . . . NCCM or at the end of the [APA] between NCCM and NCP.  Not both, either. The [d]efense'[s] . . . arguments . . . made no sense to me in 2016, made no sense to me in 2017, made no sense to me in 2018, make no sense to me now in 2019. These obligations . . . "shall survive the termination of your association with the company."  And Ryerson's association with the company unequivocally, unmistakably continued until August 22, 2016.  It's an <u>absolutely crystal-clear determination</u>.
>
> [(Emphasis added).]

Ryerson's own emails admitted into evidence cast further doubt as to the veracity of any earnest belief about the duration of the Restrictive Covenant.  As the trial court recounted, while planning out Applewood's business, Ryerson specifically stated that Terrero would have to serve as the "day-to-day account manager" because Ryerson himself was subject to a Restrictive Covenant.  We conclude the trial court's determination the agreements remained in effect until Ryerson departed NCCM in August 2016 is based upon substantial credible evidence in the record.  The court correctly determined that the "agreements

21

were aimed to protect a legitimate business interest and customer relationships and sources of future business referrals."

Ryerson also argues the Restrictive Covenant was not ancillary to the sale of a business and thus subject to a more exacting legal standard not employed by the trial court. He also maintains that the Restrictive Covenant's prohibition on soliciting "prospective clients" is overbroad warranting reversal. Ryerson's argument is devoid of merit.

The trial court found the agreements were all negotiated ancillary to the sale of Ryerson's business to Woloshin. The court fundamentally disagreed with defendants' position "that this was somehow not a sale of the business. Nothing could be further from the truth in the documents." The court explained that "when you get into covenants like this, they're enforceable in an employment circumstance, but they're even given stricter and . . . more powers when they are ancillary to the sale of a business."

Applying the three-part Solari test, the trial court aptly found the Restrictive Covenant was designed to protect NCCM and Woloshin's "legitimate interest in its customer relationship[s], [and] sources of future business referrals." It is beyond cavil that businesses have a legitimate interest "in

22

protecting trade secrets, confidential information, and customer relations."

Ingersoll-Rand, 110 N.J. at 628.

The trial court also properly found the Restrictive Covenant "was limited in scope" because it was

> [t]ailored to ensure [it was] no broader than necessary to protect Woloshin's customer relationships. . . .
>
> The restriction was customer-based. It was easy to determine. There was a limited number of customers. [Ryerson] and . . . Terrero could have solicited any other customer in the world other than . . . Woloshin's customers. They didn't.

The question of hardship focuses on the adverse impact that compliance with the covenant will have. Here, the record contains no credible evidence of compliance. Moreover, because the Restrictive Covenant was drawn so narrowly by applying only to Woloshin's current and potential clients, the covenant cannot be construed as injurious to the public.

Ryerson's overbreadth argument also lacks merit. He claims the Restrictive Covenant's restrictions on prospective customers are unenforceable. In support of his argument, Ryerson cites a Law Division case, which he contends stands for the proposition that restrictive covenants covering

23

prospective customers are per se overbroad.[2] Here, in contrast, the Restrictive Covenant specifically defines "prospective [c]ompany client" as "any and all individuals or entities identified and/or contacted by [or who contacts] [NCCM] for the purpose of becoming a[n] [NCCM] client within the [twenty-four] month period prior to the termination of [Ryerson's] employment/association." (Second alteration in original). Thus, potential clients are readily identifiable, and the trial court correctly determined the Restrictive Covenant is not overbroad.

## III.

Next, Ryerson argues the trial court erred by relying on plaintiffs' economic expert, Kempisty, when computing compensatory damages. In particular, Ryerson contends Kempisty incorrectly computed "net revenue." Because Woloshin paid sixty-four percent of all commissions to Ryerson, he contends Woloshin's remaining "profit-margin" was twenty-six percent.

The record shows Kempisty based his analysis on NCCM's prior revenue from the forty-seven clients that left plaintiffs' business as a result of Ryerson's actions. Kempisty determined that NCCM lost $129,957.32 in fees, $84,420.98 in lost insurance and annuity commissions, for a "total [n]et revenue" loss of

---

[2] Ryerson miscites and misattributes the quote in his brief. The appropriate citation is <u>Platinum Mgmt., Inc. v. Dahms</u>, 285 N.J. Super. 274, 298 (Law Div. 1995).

$214,378.30. He also calculated a present valued three-year projected revenue loss.

The trial court found Kempisty "to be a very competent witness," and his analysis was "based upon . . . a thorough review of this entire record." Kempisty's assessments were "down to the dollar" and not . . . abstract figures. The court thoroughly reviewed Kempisty's calculations and awarded plaintiffs the net revenue loss of $214,378.30,[3] approximately one-half of the amount they requested. While it was a "close call," rather than award the "economically sound" three-year loss projection, the court chose to extend the term of the Restrictive Covenant instead. We discern no error.

## IV.

Next, Ryerson argues the trial court erred by imposing the common law duty of loyalty on him. Further, if the duty were to apply, Ryerson contends his liability for any damages should be reduced since most of the "transactions" between defendants and plaintiffs' clients occurred after his employment ended.

"An employee's duty of loyalty to his or her employer goes beyond refraining from privately soliciting the employer's customers while still

---

[3] From this figure, the trial court excluded $245.04, representing a commission earned on Terrero's own IRA account.

employed. The duty of loyalty prohibits the employee from taking affirmative steps to injure the employer's business." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 305 (2001). An employee has a specific duty not to compete with his or her current employer. Cameco, Inc. v. Gedicke, 157 N.J. 504, 517-18 (1999). Four factors determine "whether an employee-agent" breached the duty of loyalty:

> 1) the "existence of contractual provisions" relevant to the employee's actions; 2) the employer's knowledge of, or agreement to, the employee's actions; 3) the "status of the employee and his or her relationship to the employer," e.g., corporate officer or director versus production line worker; and 4) the "nature of the employee's [conduct] and its effect on the employer."
>
> [Kaye v. Rosefielde, 223 N.J. 218, 230 (2015) (alteration in original) (quoting Cameco, 157 N.J. at 521-22).]

Further, "[t]he egregiousness of the employee's conduct may affect the determination of both the commission of a breach and the appropriate remedy." Cameco, 157 N.J. at 517.

Here, aside from the enforceable agreements, Ryerson breached the common law duty of loyalty. At no time did Woloshin know of or consent to Ryerson's actions to abscond with NCCM client data or directly compete for the same clients. As an outside consultant in a financial services company, Ryerson

had sufficient access and ability to render plaintiffs vulnerable. Most importantly, the severe, pervasive, and egregious nature of Ryerson's actions weigh heavily toward finding a breach of the duty of loyalty. As the trial court observed, defendants "hatched [a plan] to systematically destroy NCCM and all of its business relationships." This included "stealing" NCCM's client data, confidential files, and Woloshin's client telephone numbers.

Ryerson's assertion of a pre-termination and post-termination transition-based approach to the duty of loyalty is untethered to the law or facts here. Clearly, Ryerson's theft of plaintiffs' client data constituted a breach of duty of loyalty to his employer.

When and whether any former NCCM clients transacted business with defendants after Ryerson's termination date is of no moment. Any insinuation that the duty of loyalty is wholly inapplicable to independent contractors is belied by our Supreme Court's persistent reference to "agents" in the context of the duty and citations to the Restatements of Agency. See, e.g., Lamorte, 167 N.J. at 302 (alteration in original) (quoting Restatement (Second) of Agency § 393 (Am. L. Ins. 1958) ("Consistent with our approach to this common-law duty, the Restatement (Second) Agency provides that '[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the

subject matter of his agency.'"); Kaye, 223 N.J. at 229 (quoting Restatement (Third) of Agency § 8.01 (Am. L. Inst. 2005)) ("'[A]n agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.'"). Therefore, we conclude the trial court duly found Ryerson breached the common law duty of loyalty.

V.

Ryerson also contends the amount of attorney's fees and costs awarded was unreasonable and disproportionate in light of the compensatory damages awarded. He further argues that the attorney's fee award should be reversed because the trial court cited the factors contained in RPC 1.5(a) and the general case law to be considered in assessing the reasonableness of the attorney's fee but did not expressly apply any of the factors to the circumstances presented as required by Rule 1:7-4. Plaintiffs maintain the trial court appropriately awarded them all attorney's fees and costs from the commencement of the litigation because their punitive damage claim was dismissed. We agree with Ryerson's argument and remand for the court to address the RPC 1.5(a) factors.

"[F]ee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J. 292, 317 (1995). We award attorney's fees only where

28

"expressly provided for by statute, court rule, or contract." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 385 (2009) (quoting Packard-Bamberger Co. v. Collier, 167 N.J. 427, 440 (2001)).

The first step in determining the fee award is calculating the "lodestar," which is a reasonable hourly rate for counsel's services multiplied by the number of hours reasonably expended. Walker v. Giuffre, 209 N.J. 124, 130-31 (2012). Additionally, Rule 4:42-9(b) requires counsel to submit "an affidavit of services addressing the factors enumerated by RPC 1.5(a)," as well as "a recitation of other factors pertinent in the evaluation of the services rendered."

If the court determines that the hours expended "'exceed those that competent counsel would have expended to achieve a comparable result, a trial court may exercise its discretion to exclude excessive hours from the lodestar calculation.'" Packard-Bamberger, 167 N.J. at 446 (quoting Rendine, 141 N.J. at 336). When the fee request "far exceeds the damages recovered, 'the trial court should consider the damages sought and the damages actually recovered.'" Litton, 200 N.J. at 387 (quoting Packard-Bamberger, 167 N.J. at 446). Indeed, when the damages are disproportionately less than the fees sought, "the court must consider that fact in determining the overall reasonableness of the

attorney's fee award."  Id. at 387-88.  Ultimately, the "goal is to approve a reasonable attorney's fee that is not excessive."  Id. at 388.

Next, trial courts must determine whether the time spent "in pursuit of the 'interests to be vindicated,' the 'underlying statutory objectives,' and recoverable damages is equivalent to the time 'competent counsel reasonably would have expended to achieve a comparable result . . . .'"  Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22 (2004) (alteration in original) (quoting Rendine, 141 N.J. at 336). Further, when "the fee requested far exceeds the damages recovered, 'the trial court should consider the damages sought and the damages actually recovered.'" Litton, 200 N.J. at 387 (quoting Packard-Bamberger & Co., 167 N.J. at 546). However, "proportionality between the damages recovered and the attorney-fee award itself" is not required.  Furst,182 N.J. at 23.  Ultimately, a reviewing court "disturb[s] a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion."  Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine, 141 N.J. at 317).

RPC 1.5(a) delineates the factors to be considered by the court in determining the reasonableness of counsel fees:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

The Consulting Agreement provides that should NCCM become a party to litigation through an act or omission of Ryerson's, he "agree[d] to defend, indemnify and hold harmless [NCCM], its officers, members, employees and/or agents, from any and all settlements, judgments, awards, attorneys['] fees and costs." And the Restrictive Covenant provides that, in the event Ryerson "violate[d] or threaten[ed] to violate" any of the agreements' restrictions, NCCM "shall be entitled to . . . money damages . . . including, without limitation, all

reasonable costs and attorneys' fees incurred by [NCCM] in enforcing the provisions of this [a]greement." We agree with the trial court that these agreements entitled plaintiffs to an award of reasonable attorney's fees and costs.

The court found Ryerson and Terrero "blatantly violated" the initial injunctive orders. Their subsequent misrepresentations required plaintiffs to file additional OTSCs, contempt motions, and compelled the deposition of Applewood's prior counsel. As the court noted, had defendants been "truthful in their representations to the [c]ourt even once[,] there would be no need for all that motion practice and hearings." Rather, plaintiffs had to "expend time, effort and money . . . to ensure compliance with the [c]ourt's directives."

Further, the trial court determined that Ryerson and Terrero's conduct was sufficient to warrant a punitive damages award. Indeed, the trial court stated it had "never seen a case where there was more willful conduct." However, to "adequately compensate [plaintiffs] for the loss," the court in its discretion opted instead of punitive damages to award counsel fees since the commencement of the litigation.

On appeal, Ryerson concedes he "admitted to almost all of the alleged misconduct openly." While Woloshin is "entitled to spend any amount he wishes in a free market on attorneys," Ryerson maintains a fee award exceeding

32

the compensatory damages would yield an unreasonable windfall. He requests the fee award "be reduced to reflect an amount consistent with the efforts needed to prove the material facts of this case," and that plaintiffs overpaid for legal representation.

In sum, we affirm the trial court's September 9, 2019 amended order of judgment and compensatory damage award to plaintiffs. We vacate the trial court's September 9, 2019 amended judgment as to the award of attorney's fees and costs and remand for the court to address the RPC 1.5(a) factors and issues addressed in our opinion associated with its fee award.

To the extent we have not addressed any of the parties' arguments it is because we find them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0257-19